# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Ronald Halley,

       Plaintiff,

       v.

Aetna Life Insurance Co.,

       Defendant.

Case No. 13 C 6436

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

This is an ERISA denial of benefits case about Plaintiff Ronald Halley's entitlement to benefits under his employer's disability insurance policy. The policy was underwritten and administered by Defendant Aetna Life Insurance ("Aetna LTD Policy") and is governed by ERISA, 29 U.S.C. § 1001 *et seq.* In 2007 and 2008, Plaintiff was diagnosed with, among other things, multiple spinal disorders and osteoarthritis, and he ceased working on October 30, 2009. For more than three years, from December 29, 2009 to January 31, 2013, Defendant covered Plaintiff, but thereafter discontinued coverage based upon a reevaluation of Plaintiff's medical condition and a change in the criteria for coverage.

Plaintiff brought suit seeking to have this Court reinstate his benefits, and the parties now cross-move for entry of judgment [98] [112] under Federal Rule of Civil Procedure 52. Rule 52 allows this Court to conduct a trial on the papers and to resolve factual disputes, and this Court agrees that Rule 52 is an appropriate procedural mechanism for resolving this case. *See, e.g., Myers v. Life Insurance Co.*

*of North America*, No. 07-6197, 2009 WL 742718, at *1 (N.D. Ill. March 19, 2009); *Marshall v. Blue Cross Blue Shield Association*, No. 04-6395, 2006 WL 2661039, at *1 (N.D. Ill. Sept. 13, 2006); *Crespo v. Unum Life Insurance Co. of America*, 294 F. Supp. 2d 980, 991-92 (N.D. Ill. 2003). This Court grants Plaintiff's motion for entry of judgment [98] and denies Defendant's cross-motion [112].

## I.      Standard of Review

This Court already has determined that it will engage in a *de novo* review—and not an arbitrary and capricious review—of Defendant's denial of Plaintiff's application for benefits. PFF ¶ 9 (citing 3/25/14 Hr'g Tr.); *see also* Joint Memorandum [30]; Statement [37]. Neither party has asked this Court to reconsider that prior decision.

Under *de novo* review, the ultimate question is whether Plaintiff was entitled to the benefits he sought under the Aetna LTD Policy after January 31, 2013. *Diaz v. Prudential Insurance Co. of America*, 499 F.3d 640, 643 (7th Cir. 2007). This Court does not actually review Defendant's decision to deny benefits but rather makes an independent decision about whether, as a matter of contract interpretation applying federal common law rules, Plaintiff is entitled to benefits under the Aetna LTD Policy. *Krolnik v. Prudential Insurance Co. of America*, 570 F.3d 841, 843 (7th Cir. 2009); *Diaz*, 499 F.3d at 643. Thus what happened before Defendant is "irrelevant." *Diaz*, 499 F.3d at 643.

## II.    Findings of Fact[1]

Plaintiff is a former Vice President of Sales at Chamberlain Group (a subsidiary of Duchossois Industries), a garage door manufacturer. PFF ¶¶ 6, 11. Plaintiff holds a Bachelor's Degree in Marketing. DFF ¶ 12. Plaintiff held the Vice President of Sales position for the 10 years before he ceased working on October 30, 2009. PFF ¶ 11; Response to PFF ¶ 11; App. at 00434. As the Vice President of Sales, Plaintiff spent about half his time traveling to trade shows and visiting with customers, and the other half was spent on administrative tasks. PFF ¶ 12. While traveling, Plaintiff carried and sometimes lifted over his head a suitcase that weighed between 13 pounds (unloaded) and 25 pounds (loaded). PFF ¶ 12.

Through his employer's parent company Duchossois Industries, Plaintiff participated in a "Group Life and Accident Insurance Policy" with Policy No. GP-657484 that was underwritten and administered by Defendant Aetna Life Insurance Company ("Aetna LTD Policy"). PFF ¶ 1; App. at 00002. The Aetna LTD Policy included total disability coverage. DFF ¶ 1. The requirements for total disability coverage became more demanding once an employee received coverage for 36 months. During the first 36 months, Plaintiff qualified for coverage only if he could not perform the "material duties of [his] own occupation," whereas, thereafter, Plaintiff had to show that he was not able to "work at any reasonable occupation." DFF ¶ 1; PFF ¶ 8.

---

[1] The findings of fact are taken from the parties' proposed findings of fact and the submitted Appendix [108]. "DFF" refers to Defendant's proposed findings of fact [115], with Plaintiff's responses [118]. "PFF" refers to Plaintiff's proposed findings of fact [99], with Defendant's responses [116].

This Court quotes the relevant portions of the Aetna LTD Policy for clarity.

The total disability coverage form provided that:

> You are deemed to be totally disabled while either of the following
> applies to you:
>
> - During the period which ends right after the first 36 months
>   benefits are payable in a period of total disability: You are not able,
>   solely because of injury or disease, to perform the material duties of
>   your own occupation; except that if you start work at a reasonable
>   occupation you will no longer be deemed totally disabled.
>
> - Thereafter during such period of total disability: You are not able,
>   solely because of the injury or disease, to work at any reasonable
>   occupation.

DFF ¶ 1; PFF ¶ 8. "Reasonable occupation" is a defined term that means any

gainful activity that Plaintiff currently is or reasonably may become qualified for:

> This is any gainful activity for which you are, or may reasonable
> become, fitted by education, training, or experience. It does not include
> work under an Approved Rehabilitation Program.

DFF ¶ 1; PFF ¶ 8. The Aetna LTD Policy contains a final relevant restriction that

any occupation pay more than 80 percent of the employee's pre-disability earnings:

> You will not be deemed to be performing the material duties of your
> own occupation or working at any occupation on any day if:
>
> - you are performing at least one, but not all of the material duties of
>   your own occupation or you are working at any occupation (full-time
>   or part-time); and
>
> - solely due to disease of injury, your income from either is 80% or
>   less of your adjusted pre-disability earnings.

DFF ¶ 1; PFF ¶ 8.

In 2007 and 2008, Plaintiff developed severe back and neck pain, and was

ultimately diagnosed with, among other things, multiple spinal disorders and

osteoarthritis.  PFF ¶ 16; App. at 00420-21.  Plaintiff underwent multiple surgeries, including, on June 3, 2009, a spinal fusion performed by the neurosurgeon Dr. Jerry Bauer.  PFF ¶¶ 17, 19.  Plaintiff attempted to return to work on a part-time basis but, on October 30, 2009, ceased working altogether.  PFF ¶ 20.  Plaintiff has not since returned to work.  *See* PFF ¶¶ 11, 20

## A.    Initial Benefits Period and Social Security Administration Decision

On January 4, 2010, Plaintiff submitted a claim for long-term disability benefits under the Aetna LTD Policy.  DFF ¶ 5.  Defendant ultimately approved the claim on August 12, 2010, and began paying benefits retroactive to December 29, 2009.  DFF ¶ 5; PFF ¶ 24.  Defendant continued to pay benefits until January 31, 2013.  DFF ¶ 5.  The initial 36 month period under the Aetna LTD Policy ended December 29, 2012; however, the period was extended until January 31, 2013 while Defendant determined whether Plaintiff was eligible for continued benefits under the more demanding "any reasonable occupation" standard.  DFF ¶ 16; App. at 00445.

While receiving benefits from Defendant, Plaintiff also procured disability benefits from the Social Security Administration.  *See* PFF ¶ 37.  On April 1, 2011, the Social Security Administration found that Plaintiff had met the criteria for disability benefits under Sections 216(f) and 223(d) of the Social Security Act and awarded benefits retroactive to June 2, 2009, the alleged onset date of Plaintiff's disability. PFF ¶ 37 (citing App. at 00502-07).  Also during the initial period,

Plaintiff received ongoing medical care (which is recounted below only to the extent relevant to today's decision). *See* PFF ¶¶ 25-36, 38-44.

**B.    Aetna Disability Review and Decision**

In advance of December 29, 2012, when the initial period was set to close, Defendant issued two forms to five of Plaintiff's treating doctors.  PFF ¶¶ 45-48; App. at 0046.  Those forms are an "Attending Physician Statement" and the accompanying "Capabilities and Limitations Worksheet."  PFF ¶¶ 45-48.  The Worksheet lists various motor skills (such as sitting, standing and walking) and corresponding boxes for how often the patient can perform those activities in an 8.0 hour work day: "Occasional" (0.5 to 2.5 hours); "Frequent" (2.6 to 5.0 hours); "Continuous" (5.1 to 8.0 hours); and "Never."  *E.g.*, App. at 00588.  The Worksheet also includes a field for "Total # of hours patient capable of working per day," with the choices being: 2, 4, 6, 8 or 12 hours.  *E.g.*, App. at 00588.

Dr. Steven Mardjetko is an orthopedic physician who began treating Plaintiff no later than October 2008.  Response of PFF ¶ 16.  Dr. Mardjetko released Plaintiff to work eight hours per day with certain restrictions.  Response to PFF ¶ 46 (citing App. at 00589, 00591).  Dr. Mardjetko marked that Plaintiff could lift: (1) 1 to 5 pounds and 6 to 10 pounds frequently; and (2) 11 to 20 pounds and 21 to 35 pounds occasionally.  Response to PFF ¶ 46; App. at 00588.  Dr. Mardjetko also marked that Plaintiff could sit frequently, and stand and walk occasionally.  Response to PFF ¶ 46.

Dr. Nicholas Papanos was Plaintiff's primary care physician since, at latest, May 2009. PFF ¶ 15; App. at 00901. Dr. Papanos released Plaintiff to work two hours per day with movement restrictions. Response to PFF ¶ 47. Dr. Papanos marked that Plaintiff could lift 21 to 35 pounds "occasionally," but did not record how often Plaintiff could lift lighter or heavier weights. Response to PFF ¶ 47; App. at 00576. Dr. Papanos also marked that Plaintiff could stand and walk frequently and sit occasionally. Response to PFF ¶ 47; App. at 00576.

Dr. Jerry Bauer is the neurosurgeon who performed Plaintiff's June 2009 spinal fusion surgery. PFF ¶ 19. Dr. Bauer offered the most negative prognosis. Dr. Bauer concluded that Plaintiff could not return to work, answering questions about Plaintiff's capacity to work or participate in job training with: "Pt [patient] unable to work in any capacity at this time," "Pt is unable to work" and "Pt unable to work … becomes dizzy and unstable with increased movement." PFF ¶ 45; App. at 00579, 00581. Dr. Bauer marked that during an 8 hour work day, Plaintiff could walk no more than 10 minutes and stand no more than 1 hour. PFF ¶ 45. Dr. Bauer also marked that Plaintiff could lift 1 to 5 pounds frequently and 6 to 10 pounds occasionally. PFF ¶ 45; App. at 00581.

Two other treating physicians, Dr. Lloyd Davis and Dr. Mark Neemand, also received the two Aetna forms, but neither assessed Plaintiff's ability to return to work. PFF ¶ 48.

Because Plaintiff's "most recent physical exams … lacked measured limitations by examination or updated diagnostic testing to clearly assess [his]

current level of functionality," Defendant requested an independent medical examination ("IME"). App. at 00446.

On December 6, 2012, Dr. Herbert White, the Regional Medical Director of Franciscan St. James Health-Occupational and Environmental Health Centers, conducted a one-hour independent medical examination of Plaintiff. DFF ¶ 6; App. at 00414. Dr. White memorialized his findings in a December 13, 2012 report titled: "IME Report of Ron Halley" ("IME Report"). DFF ¶ 6; App. at 00414-27. Dr. White reviewed Plaintiff's medical records dating back to 2008 and the Social Security Administration's April 2011 disability determination; and further examined Plaintiff to measure the extent of his functional impairments. App. at 00414-25. The physical exam revealed limited impairments:

- Plaintiff appeared "well developed and well nourished," was in "no acute distress" and "did not require any assistance";

- there was "normal" range of motion in all joints except the shoulder;

- strength in all extremities was rated "5/5";

- there was no swelling in the extremities but there was "mild generalized tenderness";

- there was mild to moderate spinal tenderness in the three regions of the spine and decreased range of motion;

- Plaintiff's gait was "mildly impaired" due to foot pain and Plaintiff could not walk on his heels or toes, but he was able to ambulate without an assistive device and could "negotiate the examining table without problems"; and

- Plaintiff's mental abilities appeared "grossly normal."

PFF ¶ 49; DFF ¶¶ 7-8; App. at 00422-24.

Based on his file review and physical exam, Dr. White concluded that Plaintiff was able to perform "sedentary work" and could transition to working 40 hour work weeks. PFF ¶ 50; DFF ¶ 9. Dr. White stated:

2. Based upon my physical evaluation I feel [Plaintiff] is able to perform sedentary work. These are based on his documented upper and lower extremity disc abnormalities and resulting radiculopathies. Use of an assistive device for balance would assist him in ambulating or standing when his leg buckles.

3. [Plaintiff] can return to a full 8 hour day of work after 12 weeks. It is recommended that he start working 2 hours per day for 4 weeks, then 4 hours a day for 4 weeks, then 6 hours a day for 4 weeks then 8 hours per day (see capabilities and limitations worksheet). The above restrictions should be considered permanent unless additional treatment of his cervical spine improves his current impairments. The claimant can perform the 2 hours per day work immediately as indicated above.

App. at 00424; *see also* PFF ¶ 50.

Dr. White also completed Aetna's Capabilities and Limitations Worksheet on December 6, 2012, and appended the Worksheet to his IME Report. App. at 00427. Dr. White wrote that Plaintiff should work no more than "2 hours for 4 weeks then 4 hours for 4 weeks then 6 hours for 4 weeks then 8 hours." PFF ¶ 50. Dr. White marked that Plaintiff could lift 1 to 5 pounds occasionally, but was never to lift heavier weights. PFF ¶ 50. Dr. White imposed other restrictions, including that Plaintiff could only occasionally sit, stand and walk. PFF ¶ 50.

Plaintiff underwent four MRIs during December 13 to 17, 2012. App. at 00367.

On January 2, 2013, Plaintiff returned to Dr. Bauer for follow-up and reevaluation. PFF ¶ 55; DFF ¶ 10; App. at 00439-42. Dr. Bauer found that

Plaintiff had a "normal neurologic examination," meaning that Plaintiff had "normal strength, sensation and reflexes." DFF ¶ 10. Plaintiff also was in "no acute distress," and he appeared "well nourished" and "well developed." App. at 00440. Plaintiff, however, was positive for back pain, bone and joint symptoms, muscle weakness and neck stiffness. App. at 00440. Dr. Bauer was unable to explain Plaintiff's episodic symptoms (periodic jerking of his arm and episodic right knee buckling), yet did not consider them related to his spinal cord or nerve root compression. DFF ¶ 10. Dr. Bauer did not explicitly comment on Plaintiff's ability to work. DFF ¶ 10. Also on January 2, 2013, Defendant faxed Dr. White's December 6, 2012 Report to Dr. Davis and Dr. Mardjetko, requesting comments from them. DFF ¶ 14.

The next day, January 3, 2013, James Thompson, a Clinical Research Coordinator at Coventry Health Care, conducted a "Transferable Skills and Labor Market Analysis" to determine what occupations were available to Plaintiff based on his education, work experience, wage history and work limitations, as set forth by Dr. White's IME Report. PFF ¶ 51; DFF ¶¶ 11-13; App. at 00434-38. In preparing his Analysis, Thompson: (1) telephonically interviewed Plaintiff; (2) reviewed Dr. White's IME Report and documentation of Plaintiff's work history and education; and (3) researched comparable occupations. App. at 00434. To conduct his research, Thompson consulted employment databases and software, namely, OASYS, the Occupational Outlook Handbook, the Dictionary of Occupational Titles, O*NET and Job Browser / Skill Tran Software. App. at 00434.

Thompson issued his five-page report on January 10, 2013. App. at 00434-38. Based on his review of Plaintiff's work history and education, Thompson concluded that Plaintiff had multiple transferable skills, including: "customer service, sales, record keeping, basic computer and clerical skills, persuasion ability, directing others, scheduling, planning [and] management skills." App. at 00435-36. Thompson then identified four occupational alternatives for Plaintiff:

- Vice President of Sales

- President of Sales

- Director of Field Representatives

- Director of Compliance

PFF ¶ 51; DFF ¶ 13; App. at 00436. The first three were the "closest" matches; the fourth (Director of Compliance) was a "good" match. App. at 00436. Plaintiff satisfied the education and work experience requirements for all four occupations, and all four occupations were rated "sedentary" by the Dictionary of Occupational Titles and paid $83.20 per hour in Plaintiff's "labor market" (100 miles of Park Ridge, Illinois, where Plaintiff lived). App. at 00435-36, 00438. $83.20 is greater than the reasonable wage for Plaintiff allowed under the Aetna LTD Policy, that is, 80% of his pre-disability earnings: $59.15 per hour. App. at 00447. Thompson observed that 19,590 people were employed in each job in Illinois, and there were, on average, 550 statewide openings annually. App. at 00436-38.

On January 14, 2013, Dr. Mardjetko treated Plaintiff and sent an office visit note to Dr. Bauer. PFF ¶ 56; App. at 00443-44. Dr. Mardjetko found that the

December 13, 2012 lumbar spine MRI revealed "no significant neural compression," and the December 13, 2012 cervical spine MRI revealed "mild to moderate" stenosis in the mid-cervical spine. DFF ¶ 15; App. at 00443. Dr. Mardjetko observed that the radiographic appearance of the fusion looked "great." DFF ¶ 15.

In his office visit note, Dr. Mardjetko also addressed Dr. White's IME Report, which Dr. Mardjetko had received two weeks earlier. DFF ¶¶ 14-15; App. at 00443-44. Dr. Mardjetko said the Report was "a well-done, well-written exam in my view." DFF ¶ 15. Yet Dr. Mardjetko expressed concern about whether Plaintiff could return to full-time work after a 12 week transition period. PFF ¶ 56; DFF ¶ 15. Dr. White stated:

> I am not sure if this patient will be able to work eight hours per day, as noted in Dr. White's note. From this perspective, I have simply suggested that he do the best that he can with what he has. We will see him back in four months' time for clinical re-evaluation.

App. at 00444.

On January 18, 2013, Peter Smith, one of Defendant's claims adjusters, entered an internal file note concluding that Plaintiff was "functionally capable of gainful employment." App. at 00250-51. Smith compiled the records showing that Plaintiff could work. App. at 00250-51; *see also* PFF ¶ 52; Response to PFF ¶ 52. Smith pointed to: (1) the Capabilities and Limitations Worksheet filled out by Dr. Mardjetko and Dr. Papanos in summer 2012; (2) Dr. White's IME Report; and (3) Plaintiff's self-reported ability to go to the gym, mow his small lawn and perform light household chores. Response to PFF ¶ 52; App. at 00251. Smith also remarked

that Dr. White "did not provide a reasoning for the gradual RTW [return to work] schedule." App. at 00251.

In a January 23, 2013 letter, Defendant informed Plaintiff that it had concluded, based on the aforementioned medical reports and vocational analysis, that Plaintiff did not meet the Aetna LTD Policy requirements for long-term disability coverage after 36 months and that Defendant would be terminating benefits effective January 31, 2013.   PFF ¶ 53; DFF ¶ 16; App. at 00445-47. Defendant found that Plaintiff was "able to perform the occupational duties of other reasonable occupations which would provide at least 80% of your adjusted predisability earnings."   App. at 00446; *see also* DFF ¶ 16.   Defendant invited Plaintiff to submit additional information if Plaintiff disagreed with its disability determination.  DFF ¶ 16.

### C.    Appeal of Denial of Disability Coverage

On June 24, 2013, Plaintiff appealed Defendant's denial of benefits.  DFF ¶ 19; PFF ¶ 54.   Plaintiff attached to his appeal three relevant categories of documents: (1) the Social Security Administration's April 2011 disability determination; (2) updated medical records; and (3) a June 5, 2013 Vocational Evaluation Report from James Radke, a Clinical Research Coordinator at Associates for Career Transition.  PFF ¶ 54; App. at 00490-95.

In his five-page June 5, 2013 Vocational Evaluation Report, Radke reviewed Plaintiff's medical and occupational records, Thompson's January 10, 2013 Transferable Skills and Labor Market Analysis and employment data from

Defendant and Coventry Health Care (where Thompson worked). App. at 00490-95. Contrary to Thompson, Radke concluded that Plaintiff was "not capable of performing any occupation in the regional economy based upon his lack of capability for a full day … as well as the limitations of vocational analysis noted above." App. at 00495. Setting aside Radke's assessment of Plaintiff's capability to work, as to his vocational analysis, Radke levied five challenges against Thompson's conclusion that four occupations were available to Plaintiff.

First, the four occupations were more time-intensive than allowed by Dr. White who had released Plaintiff to work only 8 hours per day—or 40 hours per week—and not 12 hours per day, an option in the Capabilities and Limitations Worksheet. App. at 00493. App. at 00493. All four occupations offered by Thompson were taken from the "Chief Executives" section of the Occupational Outlook Handbook. PFF ¶ 59; App. at 00493. According to Radke, in "the Occupational Outlook Handbook and in common discourse, we understand that chief executive jobs require much more than a 40 hour work week. The Occupational Outlook Handbook indicates that such workers typically work evenings and weekends." App. at 00493. Radke thus estimated that chief executive positions require 50 to 60 hours of work per week. App. at 00493.

Second, the four occupations selected by Thompson were rated "sedentary" by the Dictionary of Occupational Titles, but that rating allows for occupations more physically demanding than allowed by Dr. White. App. at 00436. Dr. White permitted Plaintiff to lift up to five pounds occasionally and to carry, push, pull and

sit occasionally. PFF ¶ 58; App. at 00427. Plaintiff was never to lift more than five pounds. App. at 00427. By contrast, the Dictionary of Occupational Titles defined "sedentary" to mean: (1) lifting up to 10 pounds occasionally; (2) carrying, pushing or pulling frequently; and (3) sitting "most of the time." The Dictionary states:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

Dictionary of Occupational Titles, Appendix C, *available at* http://www.occupationalinfo.org/appendxc_1.html (last visited September 30, 2015); *see also* PFF ¶ 58; App. at 00492-93.

Third, Radke criticized Thompson for relying on O*NET to identify jobs. App. at 00493. According to Radke, O*NET is not a disability oriented source of occupational information because "there are no strength, exertional demands in the O*NET," and the Social Security Administration has rejected using O*NET in their disability analysis. App. at 00493.

Fourth, Radke rejected the suitability of each of the four occupations offered by Thompson:

- **Vice President and President (any industry).** Plaintiff held the position of Vice President of Sales before taking long-term disability, so Radke found it "inconceivable" that Plaintiff could not return to a Vice President position without medical improvement. PFF ¶ 60; App. at 00494. President naturally would be a more challenging position than Vice President.

- **Director of Field Representatives.** The Director of Field Representatives administers educational and job training programs for veterans. App. at 00493-94. Radke found this job to be outside Plaintiff's practice and expertise developed in selling garage door openers. PFF ¶ 59.

- **Director of Compliance.** The Director of Compliance is a HR position about, among other things, compliance with employment laws and conducting investigations to resolve complaints. App. at 00494. Radke also found that Plaintiff had minimal transferable skills to this job. PFF ¶ 59.

Fifth, Radke questioned Thompson's observation that 19,590 people in Illinois were employed in each of the four occupations job. App. at 00494. Thompson used the same number—19,590—for each occupation, so Radke inferred that Thompson had grouped multiple jobs together without separating out the number of positions available for each one. App. at 00494-95.

On June 6, 2013, Dr. Gerald Eisenberg examined Plaintiff and reviewed his medical history. DFF ¶ 17. Dr. Eisenberg concluded, as confirmed by recent imaging studies, that Plaintiff had osteoarthritis of the cervical lumbar spine, but found that Plaintiff was in "no acute distress" and that he had good movement in his extremities, although there was some tenderness and pain. DFF ¶ 18; App. at 00386-87.

On July 2, 2013, Dr. Eisenberg examined Plaintiff again. DFF ¶ 20. Again Plaintiff presented with no acute distress, but "somewhat limited and painful" spinal movement. DFF ¶ 20; App. at 00384-85. Dr. Eisenberg also observed that anti-inflammatory medications had reduced Plaintiff's musculoskeletal pain. DFF ¶ 20.

On or about August 2012, Defendant enlisted two physicians to review Plaintiff's medical file and to answer questions to assist Defendant in determining whether Plaintiff could perform "any reasonable occupation" from February 1, 2013 to August 9, 2013. PFF ¶ 61; DFF ¶ 21; App. at 00390-95, 00398-403. On August 6, 2013, the neurologist Dr. Vaughn Cohan memorialized his findings in a "Physician Review." DFF ¶ 21 (citing App. at 00398-403). Dr. Cohan reviewed Plaintiff's 397-page medical file, but added that "much of it covers the time period from 2009 through 2011, well before the current date range under consideration." DFF ¶ 21. Based on his file review, Dr. Cohan concluded that despite prior impairments, the most recent medical records revealed "no functional impairment that would preclude work." DFF ¶ 23; *see also* PFF ¶ 62. Plaintiff's "strength appears to be intact, and mild sensory impairment would not preclude work." DFF ¶ 23; *see also* PFF ¶ 62. Dr. Cohan also concluded that the four occupations identified by Thompson's Transferable Skills and Labor Market Analysis are "consistent with the claimant's physical and cognitive functionality." App. at 00403. Dr. Cohan expressly declined, however, to address the merits of Radke's criticisms of Thompson's vocational analysis. App. at 00402-03. Dr. Cohan stated that Radke's specific concerns "fall outside the scope of medical neurology and are better addressed by specialists in the field of vocational evaluations." App. at 00402; *see also* App. at 00403.

On August 14, 2013, Dr. Stuart Rubin, a physical medicine and rehabilitation specialist, issued his own "Physician Review." DFF ¶ 24. Dr. Rubin found that

Plaintiff suffered functional impairments, yet nonetheless concurred that Plaintiff could work at a "sedentary level" based on his review of the medical file, in particular, the medical records from December 2012 to January 2013. PFF ¶ 64; DFF ¶ 25; App. at 00393-94. However, if "the claimant [Plaintiff] surpasses the sedentary level his conditions may be exacerbated." App. at 00394. Dr. Rubin disagreed with Dr. Mardjetko's concern that Plaintiff may be unable to work eight hours per day, finding "no support" for that proposition. PFF ¶ 65; DFF ¶ 25. By contrast, Dr. Rubin agreed that Plaintiff could perform the four occupational alternatives identified by Thompson. App. at 00393, 00395. But Dr. Rubin gave no basis for that opinion. *See* App. at 00395. Nor did Dr. Rubin explicitly analyze Radke's competing vocational analysis. App. at 00395.

On multiple occasions during July to August 2013, Dr. Cohan and Dr. Rubin both endeavored to discuss their then-tentative medical opinions with Plaintiff's treating physicians, namely, Dr. Bauer, Dr. Mardjetko and Dr. Papanos. DFF ¶¶ 22, 24. To that end, Dr. Cohan and Dr. Rubin left those treating physicians multiple voicemails. DFF ¶¶ 22, 24. In addition, Defendant sent an August 9, 2013 letter to Dr. Bauer, stating when the physician reviewer attempted to contact him (on July 31, August 1 and August 2, 2013) and enclosing a Physician Review for comment. PFF ¶ 63; DFF ¶ 26. Defendant sent similar letters to Dr. Papanos and Dr. Mardjetko on August 13 and 15, 2013, respectively. PFF 66; DFF ¶¶ 27-28. None of these efforts was successful. DFF ¶¶ 22, 26-27, 29.

Defendant completed its appeals review on August 22, 2013. PFF ¶ 67; DFF ¶ 29. The same day, Defendant (through counsel) sent a letter to Plaintiff upholding its decision to terminate Plaintiff's long-term disability benefits effective February 1, 2013. PFF ¶ 67; DFF ¶ 29. Defendant recited Plaintiff's history of medical care and concluded that Plaintiff was able to engage in full-time employment in a sedentary role. DFF ¶¶ 30, 34. Also in the letter, Defendant, in a single paragraph, criticized Radke's June 5, 2013 Vocational Analysis as not addressing Plaintiff's physical capabilities. DFF ¶¶ 30, 35; App. at 00367-68. Defendant stated that Radke's

> concerns and opinion are based on multiple issues and considerations other than Mr. Halley's specific neurologic, cognitive, physical capabilities and functionality. Those issues included such things as job availability, prior level of experience, and Mr. Halley's particular knowledge regarding cognitive job responsibilities. … These alternatives were identified as viable employment opportunities within the national economy.

App. at 00367-68; *see also* DFF ¶ 35. Also in the letter, Defendant, contrary to Plaintiff's claim, addressed the Social Security Administration's April 2011 award of disability benefits and its finding that Plaintiff could not "sustain work activities for more than four hours." DFF ¶ 34; *see also* PFF ¶ 67. Defendant said it agreed with the Administration's disability determination when it was made, in April 2011, but that determination was outdated in light of new evidence, namely, Dr. White's December 2012 independent medical examination and Thompson's January 2013 vocational analysis. DFF ¶ 34; Response to PFF ¶ 67.

## III. Conclusions of Law

Plaintiff bears the burden of proving that he is entitled to benefits under the Aetna LTD Policy by a preponderance of the evidence. *Ruttenberg v. United States Life Insurance Co.*, 413 F.3d 652, 663 (7th Cir. 2005); *Curtis v. Hartford Life & Accident Insurance Co.*, 64 F. Supp. 3d 1198, 1212 (N.D. Ill. 2014). Under the Aetna LTD Policy, Plaintiff is entitled to benefits after the initial 36 month period, which, here, ended January 31, 2013, if he is unable "to work at any reasonable occupation." DFF ¶ 1; PFF ¶ 8. "Reasonable occupation" is a defined term that encompasses "any gainful activity for which you are, or may reasonable become, fitted by education, training, or experience." DFF ¶ 1; PFF ¶ 8. Even if those criteria are met, there is a further restriction. A reasonable occupation does not include jobs where Plaintiff would earn "80% or less of [his] adjusted pre-disability earnings." DFF ¶ 1; PFF ¶ 8. In interpreting policy language similar to that here, the Seventh Circuit has instructed that disability provisions should not be construed "so literally that an individual must be utterly helpless to be considered disabled." *Hammond v. Fidelity & Guaranty Life Insurance Co.*, 965 F.2d 428, 431 (7th Cir. 1992).

Based on this language, determining the existence of coverage under the Aetna LTD Policy requires a two-party analysis: this Court must first determine the extent of Plaintiff's disability (Subsection A), and then whether that disability precluded Plaintiff from working "any reasonable occupation" (Subsection B). The Seventh Circuit has confirmed that the administrator must connect the employee's

disability with his ability to work. *Tate v. Long Term Disability Plan for Salaried Employees of Champion International Corporation #506*, 545 F.3d 555, 561 (7th Cir. 2008), *abrogated on other grounds*, 560 U.S. 242 (2010). This Court concludes that Plaintiff was unable to work "any reasonable occupation."

## A. Extent of Plaintiff's Disability

The undisputed factual record contains conflicting medical evidence about the extent of Plaintiff's disability beginning in February 2013. This Court has weighed that evidence under Rule 52 and concludes that Plaintiff was healthy enough to transition to working eight hours per day with limitations. In reaching this conclusion, this Court, in particular, credits Dr. White's December 13, 2012 "IME Report of Ron Halley" for three reasons.

First, Dr. White's December 6, 2012 examination and December 13, 2012 IME Report are the most recent medical reports measuring Plaintiff's functional limitations. *See* App. at 00446. Dr. Mardjetko commented on Dr. White's examination on January 14, 2013, but did not engage in a full functional limitations analysis. The remaining doctors who saw Plaintiff in 2013—Dr. Bauer and Dr. Eisenberg—did not go even that far. They made no evaluation of Plaintiff's functional limitations or even render a bottom line opinion about Plaintiff's ability to work.

Plaintiff points to March and December 2011 opinions from Dr. Papanos and Dr. Bauer, respectively, that Plaintiff had no ability to work, but fails to explain the continuing relevance of these medical opinions. A lot can happen over a year.

There were intervening medical tests and examinations that led other doctors to conclude that Plaintiff could work or was in improved health. For example, in June 2013, Dr. Eisenberg examined Plaintiff and observed that Plaintiff was in "no acute distress" and had good movement in his extremities. DFF ¶ 18; App. at 00386-87. Even Dr. Papanos revisited his March 2011 opinion; in August 2012, Dr. Papanos found that Plaintiff could work two hours per day. Response to PFF ¶ 47; App. at 00576.

Similarly, in *Walsh v. Long Term Disability Coverage for All Employees Located in the United States of DeVry, Inc.*, 601 F. Supp. 2d 1035, 1044-46 (N.D. Ill. 2009), the Court discounted one-to-two year old medical records showing a disability because more recent records revealed a better prognosis, which was consistent with the view that the intervening medical treatment had been effective. *Cf. Aschermann v. Aetna Life Insurance Co.*, 689 F.3d 726, 731-32 (7th Cir. 2012).

Second, the medical records corroborate Dr. White's assessment of Plaintiff's functional limitations. Indeed, Dr. White's assessment is, at times, conservative in light of the overall record. Specifically, Dr. White's conclusion that Plaintiff could return to work was more conservative than the July 2012 opinion rendered by Dr. Mardjetko. Dr. Mardjetko, Plaintiff's treating orthopedic physician, released Plaintiff to work eight hours per day without any transition period. Further, the below table shows that Dr. White's functional limitations analysis often was more conservative than Plaintiff's three treating physicians who completed Aetna's Capabilities and Limitations Worksheets in July and August 2012.

| Categories | Dr. Mardjetko (7/8/12) | Dr. Bauer (7/20/12) | Dr. Papanos (8/1/12) | Dr. White (12/6/12) |
|---|---|---|---|---|
| Daily Working Hours | 8 Hours | None | 2 Hours | Transition to 8 Hours |
| Carrying | Occasional | < Occasional | Occasional | Occasional |
| Lifting<br>1 - 5 pounds<br>6 - 10 pounds<br>11 - 20 pounds<br>21 - 35 pounds | Frequent<br>Frequent<br>Occasional<br>Occasional | Frequent<br>Occasional<br>None<br>None | Unrecorded<br>Unrecorded<br>Unrecorded<br>Occasional | Occasional<br>Never<br>Never<br>Never |
| Pulling | Occasional | None | Occasional | Occasional |
| Pushing | Occasional | None | Occasional | Occasional |
| Sitting | Frequent | < Occasional | Occasional | Occasional |
| Standing | Occasional | < Occasional | Frequent | Occasional |
| Walking | Occasional | < Occasional | Frequent | Occasional |

App. at 00420, 00427, 00576, 00581, 00588.

In these regards, this case is analogous to *Wilczynski v. Kemper National Insurance Cos.*, 178 F.3d 933, 937-38 (7th Cir. 1999), where the Seventh Circuit, in a post-bench trial appeal, reviewed the administrator's disability determination under the *de novo* standard, and concluded that the employee was not disabled because, as here, "most," but not all, of the medical evidence pointed in that direction. It was true in *Wilczynski*, as here, that some of the employee's treating physicians had concluded that the employee was disabled. *Id.* at 938. Yet other treating physicians, like Dr. Mardjetko here, had reached the opposite conclusion. *Id.* Ultimately, the Seventh Circuit credited the district court's decision to place "particular emphasis" on the testimony of a non-treating doctor who, like Dr. White here, conducted the most recent medical examination and found the employee was capable of working with a ramp-up of her hours. *Id.* The Seventh Circuit thus affirmed the administrator's decision to discontinue benefits. *Id.* at 939.

Third, here multiple doctors—including one of Plaintiff's own treating physicians, Dr. Mardjetko—credited Dr. White's IME Report. In his January 14, 2013 office visit note, Dr. Mardjetko said the Dr. White's IME Report was "a well-done, well-written exam in my view." DFF ¶ 15. Plaintiff is correct that Dr. Mardjetko added his concerns about Plaintiff returning to full-time work after a 12 week transition period. Dr. Mardjetko stated:

> I am not sure if this patient will be able to work eight hours per day, as noted in Dr. White's note. From this perspective, I have simply suggested that he do the best that he can with what he has. We will see him back in four months' time for clinical re-evaluation.

App. at 00444; *see also* PFF ¶ 56; DFF ¶ 15. This Court finds that these concerns warrant some, but not much, weight once placed in context. Dr. Mardjetko was tentative in noting them, did not expressly rule out that Plaintiff could return to work full-time and failed to explain why he deviated from his opinion six months earlier that Plaintiff could be released to work eight hours per day.

Moreover, the only other doctors who evaluated Dr. White's IME Report credited it. In August 2013, the neurologist Dr. Cohan reviewed Plaintiff's 397-page medical file, and concluded that Plaintiff had "no functional impairment that would preclude work." DFF ¶¶ 21, 23. Also in August 2012, Dr. Rubin, a physical medicine and rehabilitation specialist, concurred that Plaintiff could work at a "sedentary level" based on his review of the medical file. DFF ¶¶ 24-25; PFF ¶ 64; App. at 00393-94. While neither doctor treated Plaintiff, file reviews are an accepted procedure in this Circuit. *Marantz v. Permanente Medical Group, Inc. Long Term Disability Plan*, 687 F.3d 320, 335 (7th Cir. 2012).

Plaintiff infers that Dr. Cohan is biased because he is frequently retained by disability policy administrators in other cases. Plaintiff argues that the name "Vaughn Cohan" has appeared in more than 50 opinions in federal cases nationwide, and argues that, in "nearly all of them," Cohan has reached a medical opinion adverse to the employee. Yet the same attacks can be levied against Plaintiff's vocational expert, Radke, whose name ("James Radke") appears in almost 40 opinions in federal cases nationwide. This demonstrates the flaw in Plaintiff's inference of bias from simply counting opinions: numbers disconnected from context often are not informative. To this point, it is not surprising that in opinions featuring Cohan's name, Cohan found that the employee was not disabled; in cases where Dr. Cohan found that the employee was disabled, the administrator, all else equal, was more likely to find coverage, so there would have been no subsequent litigation. *Cf. Garvey v. Piper Rudnick LLP Long Term Disability Insurance Plan*, No. 08-1093, 2012 WL 1079966, at *8 (N.D. Ill. March 30, 2012) (rejecting a similar numbers-argument as here).

Plaintiff also argues that Defendant admits that Dr. White's opinion is not credible. Plaintiff cites the January 2013 claims note where the Aetna claims adjuster remarked that Dr. White "did not provide a reasoning for the gradual RTW [return to work] schedule." Plaintiff, however, mistakes the import from the note. Far from helping Plaintiff, the adjuster questioned why Plaintiff could not begin working full-time at once. The adjuster in fact credited Dr. White's IME Report

when the adjuster reached his bottom conclusion: Plaintiff was "functionally capable of gainful employment." Response to PFF ¶ 52; App. at 00250-51.

Plaintiff's remaining arguments warrant, at best, little weight. Plaintiff argues that this Court should defer to the opinions from treating physicians, namely, Dr. Bauer and Dr. Papanos. But there is no presumption that opinions from treating physicians deserve more weight, *see Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832 (7th Cir. 2009) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)), and this Court has reviewed the medical record in context.

Plaintiff argues that Dr. White's 12 week transition plan to full-time work reveals a present disability. But that argument finds no support in the language of the Aetna LTD Policy, nor in either case Plaintiff cites. In *Govindarajan v. FMC Corp.*, 932 F.2d 634, 637 (7th Cir. 1991), the doctor rendered conflicting opinions about the employee's ability to work. In May 1986, the doctor opined that the employee was "capable of carrying out the activities of a Senior Systems Analysis," but "require[d] a work hardening program." *Id.* Yet in July 1986, the doctor opined that further evaluation was required to "determine a release to work date." *Id.* The Seventh Circuit concluded that by July 1986, the doctor either had reversed his apparent earlier position releasing the employee to work, or the May 1986 opinion was not meant as an actual release to return to work. *Id.* The Seventh Circuit did not opine, as Plaintiff argues here, that the work hardening plan was not a release to work.

Plaintiff also cites the Sixth Circuit's decision in *McDonald v. Western-Southern Life Insurance Co.*, 347 F.3d 161, 170-71 (6th Cir. 2003). Unlike here, the doctor in *McDonald* opined that the employee "might be able to return to work … on a limited trial basis." *Id.* at 170. That language was too tentative to support the administrator's decision to deny disability benefits. *Id.* at 170-71. By comparison, here, Dr. White was unequivocal. He released Plaintiff to work—without qualification—with a ramp up in hours.

Plaintiff last argues that the Social Security Administration's April 2011 disability determination should guide this Court's decision. It is well-established that the Administration's decision may be informative but is not binding. Defendant may be considering different evidence or have policy terms that are not coextensive with the disability rules applied by the Social Security Administration. *See, e.g.*, *Black v. Long Term Disability Insurance*, 582 F.3d 738, 748 (7th Cir. 2009); *Krolnik*, 570 F.3d at 844; *Williams v. Aetna Life Insurance Co.*, 509 F.3d 317, 324 n.2 (7th Cir. 2007); *Travis v. Midwest Operating Engineers Pension Plan*, No. 13-12, 2014 WL 4057372, at *4 (N.D. Ill. Aug. 15, 2014); *Marshall*, 2006 WL 2661039, at *32.

Here, as Defendant explained in its August 22, 2013 appeals denial letter, the Social Security Administration may have reached the correct decision in April 2011, but that decision now is outdated (at least insofar as today's decision is concerned) in light of the new medical evidence that never was before the Administration. DFF ¶ 34; Response to PFF ¶ 67. This Court agrees, as explained

above when discounting the 2011 "total disability" opinions from Dr. Bauer and Dr. Papanos. Likewise, in *Black*, 582 F.3d at 748, the Seventh Circuit discounted the Social Security Administration's finding of disability because the Administration did not review the same information the administrator reviewed.

In sum, the overall tenor of the medical evidence points to the conclusion that Dr. White rendered a credible assessment of Plaintiff's functional capacity to work. Plaintiff has been able to work eight hours per day beginning in December 2012, albeit with certain restrictions.

### B.     "Any Reasonable Occupation"

The fact that Plaintiff is capable of working does not end the analysis. Plaintiff may be capable of working in theory yet nonetheless entitled to disability benefits under the Aetna LTD Policy because no "reasonable occupation" is available to him. DFF ¶ 1; PFF ¶ 8.

The Aetna LTD Policy's requirement that no "reasonable occupation" be available to Plaintiff does not mean that Defendant must identify a particular job opening for Plaintiff or prove that Plaintiff actually would secure that job. That is not supported by the policy language here, *see* DFF ¶ 1; PFF ¶ 8, nor have Courts imposed such a burden on administrators when interpreting analogous language. *E.g.*, *Gutta v. Standard Select Trust Insurance*, No. 04-5988, 2006 WL 2644955, at *21-22 (N.D. Ill. Sept. 14, 2006), *affirmed*, 530 F.3d 614 (7th Cir. 2008). Instead, the Seventh Circuit has found that no occupation is available to a disabled employee when he is not able to meet that demands of that occupation due to his disability.

*E.g.*, *Tate*, 545 F.3d at 561-63; *Diaz*, 499 F.3d at 645-48; *Myers*, 2009 WL 742718, at *13, 18-20. This Court, accordingly, must scrutinize the purported occupational alternatives against the scope of the employee's release to work. For example, the Seventh Circuit in *Diaz*, 499 F.3d at 645-48, conducted a *de novo* review and reversed summary judgment in favor of the administrator. As here, in *Diaz*, the employee's doctor had imposed work restrictions that were more onerous than occupations rated "sedentary" by the Dictionary of Occupational Titles. *Id.* at 645, 647-48.

Similarly, the Seventh Circuit in *Tate*, 545 F.3d at 561, entered summary judgment for the employee because the administrator's medical evidence that the employee was not totally disabled did not "prove anything unless the improvement is shown to be connected in some rational way to her ability to work." The Court commented: "Getting better, without more, does not equal able to work." *Id.* (internal quotations omitted). The Seventh Circuit remanded this issue back to the administrator. *Id.* at 562-63.

And, in *Myers*, 2009 WL 742718, at *13, 18-20, the Court conducted a *de novo* review of the vocational analysis there and credited Plaintiff's argument at summary judgment that, similar to here, she could not perform occupations that the Dictionary of Occupational Titles rated as "light duty." *Id.* at *19. The employee's doctor released her to stand, walk and lift up to 10 pounds "occasionally," but light duty per the Dictionary of Occupational Titles meant doing those activities more often ("frequently") than the doctor had allowed. *Id.*

Here, as shown by *Diaz*, *Myers* and *Tate*, the record shows that no "reasonable occupation" is available to Plaintiff, even after this Court has credited the most favorable prognosis of Plaintiff's medical condition for Defendant. In reaching this conclusion, this Court emphasizes two fatal flaws in Thompson's vocational analysis and conclusion that four occupation alternatives are available to Plaintiff.

First, none of the four occupations offered by Thompson met the 40-hour restriction imposed by Dr. White—and no doctor released Plaintiff to work more hours. In the Capabilities and Limitations Worksheet, Dr. White had the option to release Plaintiff to work up to 12 hours per day (or 60 hours per workweek), but Dr. White selected just 8 hours per day. App. at 00427. Yet, as Radke noted, the four occupations selected by Thompson were "Chief Executive" positions taken from the Occupational Outlook Handbook that, as expected, require more than 40 hours per week. PFF ¶ 59; App. at 00493.

The hours demanded for Chief Executive positions is confirmed by the Occupational Outlook Handbook itself, which states: "Top executives often work many hours, including evenings and weekends. In 2012, about half worked more than 40 hours per week." Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook, 2014-15 Edition*, Top Executives, *available at* http://www.bls.gov/ooh/management/top-executives.htm (last visited September 30, 2015).

Likewise, O*NET, another employment database used by Thompson and which is sponsored by the Department of Labor, states that for Chief Executives: "Duration of Typical Work Week—94% responded 'More than 40 hours.'" O*NET OnLine, Summary Report for 11-1011.00 – Chief Executives, *available at* http://www.onetonline.org/link/summary/11-1011.00#menu (last visited September 30, 2015).

Not being able to work enough hours means that Plaintiff still is disabled under the Aetna LTD Policy. Instructive is the Seventh Circuit's decision in *McFarland v. General American Life Insurance Co.*, 149 F.3d 583, 584-85, 588 (7th Cir. 1998). The Seventh Circuit found that being disabled takes two forms: a qualitative or quantitative performance reduction. *Id.* at 588. Relevant here is the quantitative performance reduction. The employee can perform all the tasks assigned to him (unlike for a qualitative performance reduction), but is unable to work long enough hours or complete as many tasks. *Id.* While *McFarland* did not involve an insurance policy subject to ERISA, the Eight Circuit cited *McFarland* and applied this analysis in an ERISA denial of benefits case. *Seitz v. Metropolitan Life Insurance Co.*, 433 F.3d 647, 651 (8th Cir. 2006). The Court in *Seitz* concluded that the employee was unable to perform the material aspects of his occupation and thus was entitled to benefits under the insurance policy there. *Id.* 648, 650-52. The employee's job required him to sit five to six hours per day, but every doctor that examined the employee, including the independent examiner chosen by the administrator, released the employee to sit just two hours per day. *Id.* at 650-51.

Second, even though the four occupations selected by Thompson were rated "sedentary" by the Dictionary of Occupational Titles, the Dictionary's use of the word "sedentary" is not co-extensive with Dr. White's use of the word. App. at 00436. Dr. White also used the word "sedentary" when releasing Plaintiff for "sedentary" work, but Dr. White only permitted Plaintiff to lift up to five pounds occasionally and to carry, push, pull and sit occasionally. PFF ¶ 58; App. at 00427. Plaintiff was never to lift more than five pounds. App. at 00427. By contrast, the Dictionary of Occupational Titles defined "sedentary" to mean: (1) "exerting up to 10 pounds of force occasionally … and/or a negligible amount of force frequently"; (2) carrying, pushing or pulling frequently; and (3) sitting "most of the time." Dictionary of Occupational Titles, Appendix C, *available at* http://www.occupationalinfo.org/appendxc_1.html (last visited September 30, 2015). Plaintiff cannot meet these more onerous requirements. As Dr. Rubin warned in his August 2013 Physician Review, in fact, Plaintiff risked exacerbating his medical conditions if he surpassed the scope of his release to work. App. at 00394.

Defendant argues that the Dictionary of Occupational Titles defines the outer boundaries of sedentary and that less demanding occupations also qualify as sedentary. That is correct, but Defendant has made no showing that the four occupation alternatives here are, in fact, less demanding and consistent with Dr. White's limited work release. Thompson did not address that issue at all. Nor did Defendant's two physician reviewers: Dr. Cohan and Dr. Rubin. Nor did Defendant in its motion papers. Judgment in favor of Plaintiff is warranted under these

circumstances, where the employee has rebutted all the occupational alternatives proffered by the administrator. *See, e.g.*, *Tate*, 545 F.3d at 561-63; *Diaz*, 499 F.3d at 645-48; *Curtis*, 64 F. Supp. 3d at 1221-22, 1225; *Myers*, 2009 WL 742718, at *13, 18-20.

This Court's decision to grant judgment in favor of Plaintiff is supported by *Curtis*, 64 F. Supp. 3d at 1221-22, 1225, where the Court granted the employee's Rule 52 motion for judgment. In the insurance policy in *Curtis*, there was no long-term disability after 24 months if the employee could perform the "Essential Duties of Any Occupation." *Id.* at 1201. "Any Occupation" was defined to exclude, unlike here, jobs where further training was required. *Id.* at 1201, 1220. The administrator's vocational expert, as here, reviewed the Occupational Outlook Handbook, and also issued three vocational reports. *Id.* at 1221-22. The Court discounted the first and third reports because they failed to consider one of the employee's principal disabilities: her cognitive impairments. *Id.* at 1220-21. The second report was deficient for other reasons. Contrary to the insurance policy's definition of "Any Occupation," the expert only identified occupations that required the employee to undergo further training. *Id.* at 1221-22. The Court found the administrator's inability to identify any available occupations in the three expert reports as "compelling evidence" that no such occupations existed given the administrator's incentive to identify them. *Id.* The same is true here.

Defendant also quotes from its August 22, 2013 denial of appeal letter that Radke's "concerns and opinion are based on multiple issues and considerations

other than Halley's specific neurologic, cognitive, physical capabilities and functionality." But that is not a deficiency in Radke's analysis. The fact that Plaintiff may be medically capable of working eight hours each day is not enough to afford him benefits under the Aetna LTD Policy. There must also exist a "reasonable occupation," that is, "a gainful activity for which you are, or may reasonable become, fitted by education, training, or experience." DFF ¶ 1; PFF ¶ 8. Radke has concluded that no such gainful activity exists, even under Dr. White's view of Plaintiff's ability to work.

While this Court ultimately concurs with Radke's ultimate conclusion based on its *de novo* review of the record and applicable law, it notes for completeness that some of Radke's remaining criticisms of Thompson's vocational analysis are misplaced. For example, Radke questioned Thompson's finding that 19,590 people in Illinois were employed in each of the four occupations and that there were approximately 550 statewide openings annually for each occupation. App. at 00494. But the number and location of openings are not components of the definition of "reasonable occupation" under the Aetna LTD Policy (although this Court does not rule out that there may exist occupations with so few positions that they could not be a "reasonable occupation" under the Aetna LTD Policy). *See Herrmann v. Colvin*, 772 F.3d 1110, 1112-14 (7th Cir. 2014). Likewise, Radke rejects the suitability of the four occupations selected by Thompson, PFF ¶¶ 59-60, but fails to address that under the Aetna LTD Policy, unlike some other disability policies, "reasonable

occupation" is defined to include occupations where the employee can become qualified through training, DFF ¶ 1; PFF ¶ 8.

## IV. Conclusion

In sum, while Plaintiff—in theory—is now capable of working, the preponderance of the evidence shows that no "reasonable occupation" is available to him. Accordingly, Plaintiff meets the requirements for total disability coverage under the Aetna LTD Policy. Plaintiff's motion for judgment [98] thus is granted and Defendant's cross-motion for judgment [112] is denied. Defendant's motion to strike [123] is denied as moot.

Beyond a determination of coverage, Plaintiff also seeks three categories of damages: (1) back payments, (2) prejudgment interest and (3) attorney's fees. Plaintiff is entitled to back payments beginning February 1, 2013. The parties should meet and confer to determine the amount of back payments owed in light of this Court's decision.

The other two categories of damages are disputed, and this Court instructs the parties to file briefs of no more than 10 pages on these two issues on or before October 15, 2015.

A status hearing is set for October 29, 2015, at 9:45 a.m. in Courtroom 1725, at which time the parties should be prepared to identify the amount of back payments owed and address whether Plaintiff should be afforded prejudgment interest and attorney's fees.

Dated: September 30, 2015

Entered:

_____
John Robert Blakey
United States District Judge